**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **KARLA BURGA AND BETTY PACHECO,**<br><br>　　　　　**Plaintiffs,**<br><br>**v.**<br><br>**CITY OF PLAINFIELD, CITY OF PLAINFIELD POLICE DEPARTMENT, DETECTIVE MICHAEL BLACK, OFFICER PIERRE MCCALL, OFFICER CRAIG KENNOVIN, ABDUL WARD, JOHN DOES 1-20 (FICTITIOUS UNIDENTIFIED EMPLOYEES OF THE CITY OF PLAINFIELD POLICE DEPARTMENT) AND ABC CORP. 1-20 (UNIDENTIFIED ENTITIES),**<br><br>　　　　　**Defendants.** | Civ. No. 17-1655 (KM) (JBC)<br><br>**AMENDED OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

On March 12, 2015, plaintiffs Karla Burga and Betty Pacheco occupied a motor vehicle that was hit by a vehicle driven by defendant Abdul Ward. At the time, Ward was fleeing the scene of a shooting, pursued by the Plainfield police. Seriously injured in the accident, the plaintiffs have brought suit against Ward, the City of Plainfield, its Police Department, Plainfield Police Officer Pierre McCall, Detective Michael Black, and Officer Craig Kennovin.

Now pending before the Court are two motions for summary judgment, one filed by defendant Officer Kennovin (DE 48) and one filed jointly by the City of Plainfield, Officer McCall, and Detective Black. Plaintiffs oppose defendants' motions. (DE 51) For the reasons stated below, I will **grant** Officer Kennovin's motion for summary judgment. I will **grant in part and deny in part** the

1

summary judgment motion filed by the City of Plainfield, Officer McCall and
Detective Black.

## I.   Summary[1]

### A.   Factual Background[2]

The events in suit took place in Plainfield, New Jersey, and involved the
Plainfield police. On March 12, 2015, Detective Black was assisting with an
undercover investigation and assisting Detective Troy Alston. (DSOF ¶¶ 1–2)

---

[1]    Citations to the record will be abbreviated as follows. Citations to page numbers
refer to the page numbers assigned through the Electronic Court Filing system, unless
otherwise indicated:

"DE" = Docket entry number in this case.

"Compl." = The Complaint filed by plaintiffs. (DE 1)

"DSOF" = Joint statement of material facts filed by the City of Plainfield,
    Detective Black and Officer McCall. (DE 49-1)

"KSOF" = Statement of material facts filed by Officer Kennovin. (DE 48-2)

"PRSOF" = Plaintiffs' response to the DSOF. (DE 51-1 at 2–4)

"PSSOF" = Plaintiffs' supplemental statement of material facts (DE 51-1 at 5–
    24)

"DRSOF" = Defendants' responses to plaintiffs' supplemental statement of facts
    (DE 53-1)

[2]    The parties have, in the spirit of Rule 56.1, significantly narrowed the facts in
dispute in the DSOF and PSSOF. Accordingly, I summarize the facts as presented by
the parties, indicating where necessary those that are disputed.

Officer Kennovin submitted with his summary judgment motion a statement of
material facts. (DE 48-2 ("KSOF")) Local Rule 56.1 states in part, "[t]he opponent of
summary judgment shall furnish, with its opposition papers, a responsive statement
of material facts, addressing each paragraph of the movant's statement, indicating
agreement or disagreement and, if not agreed, stating each material fact in dispute
and citing to the affidavits and other documents submitted in connection with the
motion." Plaintiffs, however, failed to address the KSOF.

If a party fails to address the other party's properly supported assertion of fact,
the court may consider "grant[ing] summary judgment if the motion and supporting
materials—including the facts considered undisputed—show that the movant is
entitled to it …." Fed. R. Civ. P. 56(e). Local Civil Rule 56.1(a) deems a movant's
statement of material facts undisputed where a party does not respond or file a
counterstatement. L. Civ. R. 56(a). Nevertheless, where plaintiffs' briefing provides
support that disputes a statement in the KSOF, I will treat those facts as disputed.

Detective Alston relayed to Detective Black that a dispute had broken out near Berckman Street and East Sixth Street. (DSOF ¶ 2) Detective Black responded to the call and drove towards the area in an undercover, unmarked vehicle that did not have emergency lights and sirens. (PSSOF ¶¶ 43–44) As he approached that area, he saw a man aggressively waving his hands. (DSOF ¶ 3) The man then got into a gray car. Detective Black heard gun shots, which he believed came from the gray car. (DSOF ¶¶ 3 –4)

Immediately after the shots were fired, the gray car sped off. (The gray car was driven by defendant Abdul Ward, though Black did not know this at the time. *See infra*.) Detective Black followed in his unmarked car. (DSOF ¶ 5) The gray car was traveling at a high rate of speed. Black testified that he performed all actions of an officer in pursuit except for activating lights or sirens, because his car had none. (PRSOF ¶ 5) Black radioed that gunshots had been fired, provided a description of the gray car, and described its direction of travel. (DSOF ¶ 5) Officer McCall, Officer Kennovin, and Detective Auricchio, among others, heard Detective Black's call over the radio. (DSOF ¶ 6; KSOF ¶ 2)

Two marked patrol cars, one of them driven by McCall, drove to the area in response to the call of Detective Black, who spotted them as they arrived. (DSOF ¶¶ 6–7) Detective Black instructed McCall to pull over the gray car. (DSOF ¶ 7) McCall was in marked patrol vehicle number 62, a Ford Taurus equipped with lights and sirens. (DSOF ¶ 8) McCall made a U-turn and pursued the gray car. (DSOF ¶10) The parties dispute whether, once McCall began pursuing the gray car, Black ceased his pursuit. (DSOF ¶¶ 11–12; PRSOF ¶¶ 11–12)

At the time he began pursuing the gray car, McCall did not know the identity of the driver, who was later identified as Ward. (DSOF ¶¶ 23, 27) During the chase, Ward was travelling as fast as 60 mph, well in excess of the 20 to 25 mph speed limit in the residential neighborhoods through which he was travelling. (DSOF ¶ 13) Officer McCall testified that he was driving approximately 50 mph in pursuit. (*Id.*) Ward led McCall and other officers on a

chase through the neighborhood, ultimately turning and driving the wrong way (westbound) down a one-way street, East 6th Street. (DSOF ¶ 14)

Still driving the wrong way down 6th Street, Ward crossed several avenues and then approached the intersection of Central Avenue.[3] At the time, plaintiff Karla Burga was driving her Jeep Cherokee with her mother, Betty Pacheco, down Central Avenue. (PSSOF ¶¶ 1–3) Burga recalled driving and talking with her mother as she approached 6th Street. As she recollected the events, she did not have the radio on, and was driving at approximately 20 mph. (PSSOF ¶¶ 4–5) When the light turned green for Ms. Burga, she started to cross the intersection. Mr. Ward's gray car emerged from East 6th Street and collided with plaintiffs' Jeep Cherokee. (DSOF ¶ 14; PSSOF ¶ 3; KSOF ¶ 7) Only Mr. Ward's vehicle collided with the plaintiffs' Jeep; no police vehicles collided with the Jeep. (DSOF ¶¶ 15–16)

The impact was such that Ms. Burga's vehicle was flipped over onto its roof. (KSOF ¶10) Ms. Burga was knocked unconscious and both plaintiffs received medical attention at the scene before being transported to the hospital. (KSFO ¶ 12; PSSOF ¶¶ 7–8, 14–16)

A handgun was recovered from Mr. Ward's lap inside the gray car. (DSOF ¶ 26) Ward was placed under arrest and was ultimately charged in a ten- count indictment. He pled guilty to an amended charge of First-Degree Aggravated Manslaughter arising from the shooting. (DSOF ¶¶ 27–28; KSOF ¶ 9)

The entire police pursuit of Ward lasted less than five minutes. (DSOF ¶¶ 15–16) The roads were dry, the weather was sunny and clear, traffic was light, and no pedestrians were seen in the area of the pursuit. (DSOF ¶¶ 21–22) Plaintiff Burga testified that she did not hear any emergency sirens or see any emergency lights prior to the accident. (PRSOF ¶ 19; PSSOF ¶ 6; DRSOF ¶ 6)

---

[3]     At this point, East 6th St. had become West 6th St., according to Google Maps. https://www.google.com/maps/place/600+Central+Ave,+Plainfield,+NJ+07060/@40.6129202,-74.4235438,17z/data=!3m1!4b1!4m5!3m4!1s0x89c3b9f1309afc5f:0x8d2d43b19cab889c!8m2!3d40.6129202!4d-74.4213498?hl=en

Ms. Pacheco agreed. (PRSOF ¶19; PSSOF ¶¶ 9–13) Neither plaintiff recalled seeing or hearing the gray car prior to impact. (DSOF ¶¶ 19–20)

### B.    New Jersey AG Guidelines for police pursuits

It is undisputed that Sargent Kennovin, Officer McCall, and Detective Black graduated from the John H. Stamler Police Academy, where they received training on police pursuits. (DSOF ¶¶ 29–35) They all further received training biannually on police pursuits. (*Id.*) McCall testified that he recalled a lot of things about his training. (DSOF ¶ 30) He testified that Plainfield had its own rules regarding police pursuits that were more restrictive than those contained in the New Jersey Attorney General ("AG") Guidelines. He could not recall specifically what those differences were. (PRSOF ¶ 30; PSSOF ¶ 87)

The AG guidelines contain the following definition of "pursuit driving":

> an active attempt by a law enforcement officer operating a motor vehicle and utilizing emergency warning lights and an audible device to apprehend one or more occupants of another moving vehicle when the officer reasonably believes that the driver of the fleeing vehicle is aware of the officer's attempt to stop the vehicle and is resisting apprehension by increasing vehicle speed, ignoring the officer or otherwise attempting to elude the officer

(DE 49-7 (Ex. R) at 290) A "primary" pursuit vehicle is defined as the one "that initiates a pursuit or any unit that assumes control of the pursuit as the lead vehicle (the first police vehicle immediately behind the fleeing suspect)." A "secondary" pursuit vehicle is "[a]ny police vehicle which becomes involved as a backup to the primary unit and follows the primary unit at a safe distance." (*Id.*)

The guidelines further outline who has the "Authorization to Pursue":

1. A police officer may only pursue

   a. When the officer reasonably believes that the violator has committed an offense of the first or second degree, or an offense enumerated in Appendix A of this policy, or

   b. When a police officer reasonably believes that the violator poses an immediate threat to the safety of the public or other police officers.

(*Id.* at 291)

The AG Guidelines impose further restrictions on police pursuits:

> "[N]o more than two police vehicles (primary unit and secondary unit) shall become actively involved in a pursuit unless otherwise specifically directed by a supervisor." (PSSOF ¶ 18; DRSOF ¶ 18)

> "An unmarked police vehicle will not participate in a vehicular pursuit unless it is equipped with an emergency light and an audible device. The unmarked car shall relinquish primary unit status immediately upon the participation of a marked vehicle." (Ex. R at 294)

> Should a vehicle in pursuit that is equipped with lights and sirens fail to activate its lights and sirens, this would violate the AG guidelines. (PSSOF ¶ 19; Ex. R at 294)

The parties dispute the number of police vehicles and which officers were involved in the pursuit of Mr. Ward's gray car. There is evidence in the record that at least one car, and perhaps more, were in pursuit. Plaintiffs contend that at a minimum four officers (defendants McCall and Black, and non-defendants Hafeken and Lordi) were involved in the police pursuit.

There is no dispute that McCall was in pursuit of Mr. Ward and was the first marked car to arrive after Detective Black radioed for assistance. It appears that Lieutenant Hafeken, who is not a defendant here, arrived second. The parties dispute whether Hafeken was "in pursuit" but it appears that he was the secondary vehicle behind McCall. (DE 51-8 at 54-55 (Testimony of Lieutenant Hafeken) stating that as he approached 5th Street he saw the suspect vehicle and a marked patrol car). Officer Gregory A. Lordi, likewise not a defendant here, was also involved. He fell into line somewhere behind Hafeken. (*See* DE 49-7 at 157 (testimony of Officer Lordi)) Lordi testified that at times he was approximately 500 feet behind McCall. (PSSOF ¶¶ 128–29)[4]

It is unclear where Black was driving while McCall, Hafeken, and Lordi followed Ward. Detective Black testified that because he was in an unmarked

---

[4]     Officers Hafeken and Lordi are not named as defendants. Their actions are included to round out the factual picture.

car without, *e.g.,* overhead lights, he only followed Ward's gray car until the marked car driven by McCall arrived. (PSSOF ¶¶ 50–73) After that point, defendants assert, Black did not continue to follow Ward and did not participate in the pursuit. Plaintiffs maintain that Black continued to participate in the pursuit of Ward. (DSOF ¶¶ 11–12; PRSOF ¶¶ 11–12) For example, Black continued to radio direction-of-travel information, which would be required of a participant in a police pursuit, and would also imply that he remained close enough to observe. (PSSOF ¶¶ 74, 147)

There is no testimony that any of these officers were directed to stand down by the Watch Commander, Lieutenant Hafeken. (DSOF ¶ 17) Defendants dispute that Hafeken, Lordi, and Black were in "pursuit"; they admit, however, that Hafeken and Lordi (and of course McCall) were all present and driving the wrong way down 6th Street, where the accident occurred. (PSSOF ¶ 137) The precise nature of Defendants' objection to the term "pursuit" as it relates to (non-defendant) Hafeken, is unclear. (DRSOF ¶ 137) As to non-defendant Lordi, Defendants point to his testimony that he was much farther behind McCall and that he stopped at each intersection when driving. (PSSOF ¶¶ 128–33, 140–145)

Officer Kennovin stands on a different footing. Sergeant Kennovin, as noted above, heard Black's call. He and two other officers drove to the area. (PSSOF ¶¶ 22–27) Kennovin, however, was not involved in following or pursuing Ward's car at any time. (DSOF ¶ 36; PRSOF ¶ 36; KSOF ¶ 8) Kennovin arrived after the collision had occurred and then began securing the scene. (KSOF ¶¶ 9, 11)

The Officers' testimony suggests that they were aware of the AG guidelines. All received training. Officer Kennovin agreed during his deposition that should it be established that there were three cars—driven by McCall, Hafeken, and Lordi—in pursuit of the gray vehicle, this would have exceeded the AG's guidelines. (PSSOF ¶¶33–35) Moreover, Hafeken testified that, if Lordi had been behind him with his lights and sirens activated, then Lordi would be considered to have been involved in the pursuit. (PSSOF ¶ 165)

As to whether sirens and lights were used, the record remains disputed. Each of the officers operating a marked police vehicle testified that the lights and sirens were switched on. McCall stated that he had his lights and sirens activated as he pursued Ward. (DSOF ¶ 24; PSSOF ¶ 92) Non-defendant Hafeken also asserted that he was operating a marked police car with emergency lights and sirens activated. (DSOF ¶18) Non-defendant Lordi testified that when he first arrived, neither he nor McCall had their lights and sirens activated, but that he subsequently turned his on. (PSSOF ¶¶ 130–33) In depositions, several of the officers were played audio recordings of the pursuit. McCall, after listening to the audio, confirmed that he could not hear his siren and he acknowledged that one should be able to hear the sirens on the recording if they were on. (PSSOF ¶¶ 120–21)[5]

### C.    Procedural History

On March 10, 2017, plaintiffs Burga and Pacheco filed their civil complaint, which has not been amended. It asserts seven causes of action:

Count 1: Civil Rights/Due Process Violations (14th Amendment/42 U.S.C. 1983) (against defendants Black, McCall, and Kennovin)

Count 2: *Monell* liability (against City of Plainfield, Plainfield Police Dep't)

Count 3: Conspiracy (42 U.S.C. §§ 1985, 1986) (against all defendants except Ward)

Count 4: New Jersey Civil Rights Act (against all defendants except Ward)

Count 5: New Jersey Tort Claims Act (against defendants Black, McCall, and Kennovin).

Count 6: Negligence (against defendant Adbul Ward only)

Count 7: Punitive Damages

---

[5]    Less relevantly (because his physical location during the events is unclear), Black also testified that the first time he could hear sirens on the audio recording was just before the crash. (PSSOF ¶¶ 80, 84) Kennovin, who arrived after the accident, agreed that sirens could not be heard on the audio recording until a few seconds before the crash. (PSSOF ¶ 41)

On May 1, 2017, the City of Plainfield Police Division moved to dismiss the Complaint, asserting that as a department of city government it is not a separate legal entity with the capacity to sue or be sued.[6] (DE 14). The parties filed, and the Court entered, a stipulation dismissing the Police Division with prejudice. The City of Plainfield itself remains as a defendant. (DE 16; DE 18)

The parties then began discovery (DE 21); however, discovery was stayed pending further order of the Court given that defendant Abdul Ward was being prosecuted by the State of New Jersey and the Union County Prosecutor's Office advised that they would not provide discovery while that prosecution was ongoing. (DE 22) Mr. Ward was then sentenced in or around March 2, 2018 (DE 23). Fact discovery recommenced. (DE 25) Expert discovery was then conducted and all discovery was completed in or about October 2019.

On August 29, 2019, Magistrate Judge Clark issued an order outlining the schedule for the filing of dispositive motions. (DE 41). Four defendants moved for summary judgment. (DE 48; DE 49) The City of Plainfield, Detective Michael Black, and Officer Pierre McCall filed a joint motion for summary judgment on Counts 1 through 5 and 7, while Officer Craig Kennovin separately moved for summary judgment on these same counts.[7] (*Id.*) Plaintiffs oppose those motions. (DE 51)

## II.   Discussion

### A.   Legal standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[6]   *See, e.g.,* N.J. Stat. Ann. § 40A:14-118 (municipal police department is "an executive and enforcement function of municipal government"); *Padilla v. Twp. of Cherry Hill,* 110 F. App'x 272, 278 (3d Cir. 2004); *Mitchell v. City of Jersey City*, No. 15-6907, 2016 WL 1381379 at *1 n.1 (D.N.J. Apr. 7, 2016).

[7]   The only claim not addressed by these motions is Count 6, which asserts state tort claims against co-defendant Abdul Ward only. Accordingly, this Opinion does not address the merits of Count 6.

*See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex*, 477 U.S. at 322-23. "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of

10

material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### B.   Count 1: Civil Rights Violation Under 42 U.S.C. § 1983

#### i. Standard

The Count 1 Section 1983 claim seeks to hold defendants Black, McCall, and Kennovin liable for substantive due process constitutional violations under a "state-created danger" theory of liability. When a federal right is infringed by an official acting under color of state law, the Civil Rights Act of 1871 provides a remedy:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Section 1983 allows a party who has been deprived of rights, privileges, or immunities secured by the Constitution to seek damages and injunctive relief. *See id.*

Section 1983 is not in itself a source of substantive rights; it provides a remedy for violations of rights protected by other federal statutes or by the U.S. Constitution. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985).

Therefore, in evaluating a § 1983 claim, a court must first "identify the exact contours of the underlying right said to have been violated" and determine "whether the plaintiff has alleged a deprivation of a constitutional right at all." *Id.* (*citing Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998)).

A prima facie case under § 1983 requires plaintiffs to demonstrate that (1) a person deprived them of a federal right; and (2) the person who deprived them of their right acted under color of state law. *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) (citing *Gomez v. Toledo,* 446 U.S. 635, 640 (1980)). Element (2)—whether the officer here acted under color of state law—is not disputed by the parties. The parties' dispute arises as to element (1)—whether plaintiffs were deprived of a federal right.

Whether element (1) of plaintiffs' "state-created danger" theory depends on whether plaintiffs have satisfied the Third Circuit's four-part test as outlined in *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996). In *Kneipp*, the Third Circuit held that in order to state a viable claim where the state had created a danger a plaintiff must show:

> (1) that the harm ultimately caused to the plaintiff was foreseeable and fairly direct;
>
> (2) the state actor acted in willful disregard for the plaintiff's safety;
>
> (3) there was some relationship between the state and the plaintiff; and
>
> (4) the state actor used his authority to create an opportunity for danger that otherwise would not have existed.

*Id.* at 1208.

As to element 1, the question is whether the harm was foreseeable and direct. "To adequately plead foreseeability ..., we require a plaintiff to allege ... an awareness of risk that is sufficiently concrete to put the [state] actors on notice of the harm." *Henry v. City of Erie*, 728 F.3d 275, 282 (3d Cir. 2013) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 238 (3d Cir. 2008)).

Element 2 requires not just negligence, but that "a state actor acted with a degree of culpability that shocks the conscience." *K.W. by & through White v. Se. Pennsylvania Transportation Auth.*, 760 F. App'x 104, 107 (3d Cir. 2019)

(citing *Sanford v. Stiles*, 456 F.3d 298, 304 (3d Cir. 2006)); *see also Lewis*, 523 U.S. 833. "While the state actor's behavior must always shock the conscience, the specific level of culpability required to shock the conscience increases as the time to deliberate decreases. Where state actors have an opportunity to deliberate and make 'unhurried judgments,' deliberate indifference is sufficient." *M.J.G. v. Sch. Dist. of Philadelphia*, 774 F. App'x 736, 744 (3d Cir. 2019). The late Chief Judge Simandle explicated that standard thus:

> [It] depends on the particular circumstances of the case. *Walter*, 544 F.3d at 192 (quoting *Miller v. City of Phila.*, 174 F.3d 368, 375 (3d Cir.1999)). Where state officials are asked to make split-second decisions in "'a hyperpressurized environment,' an intent to cause harm is usually required....'" *Id.* (quoting *Sanford v. Stiles*, 456 F.3d 298, 306 (3d Cir. 2006)). By contrast, "where officials are afforded the luxury of a greater degree of deliberation and have time to make 'unhurried judgments,' deliberate indifference is sufficient to support an allegation of culpability." *Phillips*, 515 F.3d at 240–41 (emphasis in original). The Third Circuit has recognized a middle-ground standard in other circumstances:
>
> > [W]here the circumstances require a state actor to make something less exigent than a "split-second" decision but more urgent than an "unhurried judgment," i.e., a state actor is required to act "in a matter of hours or minutes," a court must consider whether a defendant disregarded a "great risk of serious harm rather than a substantial risk."
>
> *Id.* at 241 (quoting *Sanford*, 456 F.3d at 306). The Third Circuit has described this middle-ground standard as: "gross negligence and arbitrariness—the state actor must 'consciously disregard[ ] a great risk of serious harm.'" *Walter*, 544 F.3d at 193.

*Van Orden v. Borough of Woodstown*, 5 F. Supp. 3d 676, 683 (D.N.J. 2014).

The relationship requirement of element 3 "contemplates some contact such that the plaintiff was a foreseeable victim of [the] defendant's acts in a tort sense." *Kneipp*, 95 F.3d at 1209 n. 22. The criterion that there be "some contact" between a state actor and a plaintiff embodies the requirement that the danger created by a state actor cannot be directed toward the "public at large," but instead must be particular to a plaintiff.

Element 4 "of these conjunctive elements reflects the fact that the substantive component of the Due Process Clause 'is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without due process of law. . . .'" *K.W. by & through White*, 760 F. App'x at 107 (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 126 (1992)).

### ii.  Analysis

#### 1.  Substantive due process violation

Defendants Black, McCall, and Kennovin focus in their briefing on element 2, whether their conduct "shocks the conscience." (DE 49-2 at 24-31; DE 48-4 at 8-11) Officers Black and McCall assert that in the case of a rapidly developing pursuit of a dangerous individual, plaintiffs can only satisfy the "shocks the conscience" standard by establishing that defendants had an intent to harm plaintiffs. *See* pp. 12–13, *supra*. (DE 49-2 at 24-31) Black and McCall assert that they were responding to an emergency involving a dangerous suspect who was fleeing after firing a gun. (*Id.* at 29-31) There is no evidence, they say, that either one of them intended to harm these unfortunate bystanders. (*Id.*) Rather, they were simply responding to the unfolding situation and trying to apprehend someone who they perceived to be a danger to the public. (*Id.*)

Officer Kennovin asserts that his conduct cannot reach the level of "intent to harm," as it is undisputed that he was not part of the pursuit of Mr. Ward and only arrived on scene after the unfortunate accident. (*See*, *e.g.*, KSOF ¶¶ 9, 11) In response to the distress call, he quickly but carefully drove to the scene, and did not create any undue risk to plaintiffs. (DE 48-4 at 11)

Plaintiffs aver that a lower standard should apply under the "shocks the conscience" framework. The officers, they say, had "at least some time to deliberate before deciding whether and how to pursue the suspect." (DE 51 at

9) Thus, they say, the test is not deliberate indifference, but the lower standard of conscious disregard of a great risk of serious harm. *See* pp. 12–13, *supra*.

Under a conscious-disregard standard, plaintiffs contend that it is both material and disputed whether defendants complied with the AG's guidelines. They cite in particular disputes over the number of vehicles engaged in pursuit and whether the officers activated their lights and sirens to warn plaintiffs. (DE 51 at 9-10)

I find, however, that the deliberate intent standard, not the conscious disregard standard, applies here. The court may even assume for purposes of argument that these officers conducted the pursuit in a negligent or reckless manner, or that they violated the AG's guidelines by exceeding the permitted number of vehicles and failing to use their sirens and lights. Even so, this conduct would fail to rise to the required level of intent for a constitutional violation. "Regardless whether [the officer's] behavior offended the reasonableness held up by tort law or the balance struck in law enforcement's own codes of sound practice, it does not shock the conscience, and petitioners are not called upon to answer for it under § 1983." *Lewis*, 523 U.S. at 855.

The record establishes beyond doubt that this was a high-speed chase of a dangerous fleeing suspect. The Supreme Court held in *Lewis* that in such a case, an intent-to-harm standard applies. *Id.* As the Third Circuit recently summarized:

> *Lewis* involved a police officer who was pursuing two suspects actively fleeing the police in a dangerous manner. *Id.* at 836, 118 S.Ct. 1708. The suspects, riding together on a motorcycle, were weaving in and out of traffic at high speeds. *Id.* After the driver of the motorcycle lost control and crashed, the pursuing officer accidentally struck and killed one of the suspects. *Id.* at 837, 118 S.Ct. 1708. The Court characterized the situation as involving an officer who had to make an "instantaneous" reaction to the fleeing suspects' "outrageous behavior[.]" *Id.* at 855, 118 S.Ct. 1708. It held that, in such circumstances, a police pursuit will not give rise to a substantive due process violation absent a specific intent to harm. *Id.* at 854, 118 S.Ct. 1708. In reaching that conclusion, the Court noted that conduct intended to cause harm was "most likely to rise to the conscience-shocking level" and that negligent conduct

was never sufficient for a substantive due process claim. *Id.* at 849, 118 S.Ct. 1708. It also explained, however, that conduct falling between intentional conduct and negligent conduct was "a matter for closer calls" that could, given the right circumstances, be actionable under the Fourteenth Amendment. *Id.*

*Lewis*, then, clearly established that an officer can be liable for a substantive due process violation resulting from a high-speed pursuit of a dangerously fleeing suspect only if the officer intended to cause harm.

*Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 720 (3d Cir. 2018).

Mr. Ward's responsibility and potential liability for plaintiffs' serious injuries is not at issue on these motions. However, it cannot be said that the officers, in electing to pursue the fleeing Ward, violated plaintiffs' constitutional rights. The officers were responding to a true emergency: Detective Black believed that he had just witnessed Mr. Ward fire a handgun and speed away in the gray car. Mr. Ward's behavior—engaging in a shooting, dangerously operating a motor vehicle at excessive speeds, and driving the wrong way down a one-way street in a residential area—fully justified Black's judgment that he was a dangerous suspect who had to be apprehended. Black had to make an instantaneous decision. He radioed for assistance and additional officers, including McCall, responded. They, too, understood that they were actively pursuing a fleeing suspect who was endangering the public. Officer McCall was in the lead, *i.e.,* immediately behind Ward's gray car. The record is clear that the pursuit took place at high speed, developed rapidly, and lasted at most 5 minutes. The circumstances here are thus akin to those in *Lewis.* As *Lewis* and *Sauers* establish, an officer can only be liable for a substantive due process violation resulting from a high-speed pursuit of a dangerously fleeing suspect if the officer intended to cause harm. *Lewis*, 523 U.S. at 854–55; *Sauers*, 905 F.3d at 720.

As to defendants Black, McCall, and Kennovin, there is no evidence of intent to cause harm to plaintiffs. Failure to use lights or comply with AG guidelines, if it occurred, was perhaps negligent. But not even plaintiffs

contend that this evidence amounts to an "intent to harm"; rather, plaintiffs assert that this behavior, if proven, amounts to "a conscious disregard of a great risk of serious harm." (DE 51 at 10) That, as I have held, is not the standard; intent is required. This was an accident, created by Mr. Ward's reckless and criminal behavior; the plaintiffs, innocent bystanders, were unfortunately victims of it. The evidence is insufficient to establish that it was any officer's intent to harm plaintiffs.

Therefore, I find that plaintiffs have not established that defendants violated their constitutional rights under Section 1983.

### 2.    Qualified Immunity

Defendants Black, McCall, and Kennovin all contend in the alternative that, even if this Court were to find that they violated plaintiffs' constitutional rights, they would be entitled to qualified immunity. (DE 48-4 at 17–18; DE 49-2 at 31–37) Notwithstanding that plaintiffs have failed to establish a cognizable claim under 42 U.S.C. § 1983, I find in the alternative that officer defendants are also entitled to the protections of qualified immunity.

"The doctrine of qualified immunity insulates government officials who are performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982)). The U.S. Supreme Court has established a two-part analysis that governs whether an official is entitled to qualified immunity. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S. Ct. 2151 (2001). That two-part analysis inquires as to (1) whether the facts put forward by the plaintiff show a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *Id.*; *James*, 700 F.3d at 679.

As stated above, no private constitutional right has been violated. Thus plaintiffs cannot overcome the first prong required to pierce qualified immunity.

17

Nevertheless, I will, as required, consider the second prong, *i.e.,* whether the right allegedly violated was clearly established. *See Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638 (3d Cir. 2015) ("[W]hile issues of fact may preclude a definitive finding on the question of whether the plaintiff's rights have been violated, the court must nonetheless decide whether the right at issue was clearly established.").

The second prong of qualified immunity asks whether the right was so clearly established that the officers should have known that they were committing a constitutional violation under the circumstances. While courts are not to define clearly established law at a high level of generality, *Thompson v. Howard*, 679 F. App'x 177, 182 (3d Cir. 2017), the precise factual circumstances of a given case need not have been previously considered. *Kelly v. Borough of Carlisle*, 622 F.3d 248, 259–60 (3d Cir. 2010) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances, as long as the law gave the defendant officer fair warning that his [or her] conduct was unconstitutional." (internal citations and quotations omitted)).

Here the right was not clearly established. In March 2015, at the time this accident occurred, there was no clearly established Section 1983 substantive due process violation arising from a high-speed police pursuit involving a dangerous suspect who was fleeing from the scene of a crime, particularly where intent to harm is absent. *Lewis,* 523 U.S. 854–55. This is so because in cases like this one, the "[suspect's] outrageous behavior was practically instantaneous, and so was [the officer's] instinctive response. While prudence would have repressed the reaction, the officer's instinct was to do his job as a law enforcement officer, not to induce [the suspect's] lawlessness, or to terrorize, cause harm, or kill." *Lewis*, 523 U.S. at 855. That remains the law. "We recognize that most high-speed police pursuits arise when officers are responding to emergencies or when they must make split-second decisions to pursue fleeing suspects. Our holding today does nothing to alter the longstanding principle that, in such cases, constitutional liability cannot exist

18

absent an intent to harm." *Sauers*, 905 F.3d at 723. In short, even assuming there was an error in judgment, it would not have been clear to a reasonable officer in this high-pressure situation that he should not chase this fleeing gunman.

Nor would knowledge of potential liability for negligence or violations of the AG guidelines have put the officers on notice that their conduct violated the Constitution. The Supreme Court had already held long ago in *Lewis* that "[r]egardless of whether [the officer's] behavior offended the reasonableness held up by tort law or the balance struck in law enforcement's own codes of sound practice," it does not shock the conscience for purposes of a § 1983 claim. *Lewis*, 523 U.S. at 855 (decided in 1998).

Accordingly, the motions for summary judgment by defendants Black, McCall, and Kennovin are **granted** as to Count 1.

### C.    Count 2: *Monell* Liability

Plaintiffs also assert a *Monell* claim against the City of Plainfield, alleging that the city was liable for violations as a result of

> failing to properly train the individual Defendants regarding lawful police pursuits; failing to properly supervise and discipline the Defendants with respect to police pursuits; failing to have proper policies and rules and regulations regarding police pursuits; failing to properly monitor police pursuits to ensure compliance with the Attorney General guidelines; and negligently hiring and/or retaining the individual Defendant Police Officers responsible for the constitutional violations committed on the Plaintiff.

(Compl. ¶ 32)

The City of Plainfield contends that the Plainfield police officers complied with the AG's guidelines regarding pursuit. (DE 49-2 at 16–17) Moreover, Plainfield asserts that there is no causal link between any purported official policy and the purported constitutional violation that led to the harm here. (DE 49-2 at 18) Plaintiffs brief in opposition does not address these arguments. As discussed below, I will **grant** the City of Plainfield's motion for summary judgment as to Count 2.

### i.  Standard

A municipality cannot be sued under § 1983 because of an injury inflicted solely by its employees or agents, but it can be held liable when the injury inflicted is a result of a policy or custom the municipality has adopted. *See Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996). While "in a substantive due process case arising out of a police pursuit, an underlying constitutional tort can still exist even if no individual police officer violated the Constitution . . . The City is liable under section 1983 if its policymakers, acting with deliberate indifference, implemented a policy of inadequate training and thereby caused the officers to conduct the pursuit in an unsafe manner and deprive the plaintiffs of life or liberty." *Fagan v. City of Vineland*, 22 F.3d 1283, 1292 (3d Cir. 1994).

Thus, in order to establish a prima facie case for *Monell* liability, the plaintiff must "(i) demonstrate the existence of an unlawful policy or custom; (ii) that resulted in a deprivation of the rights, privileges, or immunities secured by the Constitution or laws of the United States; and (iii) that the policy or custom was the proximate cause of the alleged deprivation." *Maldonado v. City of Passaic Bd. of Educ.*, No. CV1712245ESJAD, 2020 WL 289649, at *7 (D.N.J. Jan. 21, 2020) (citing *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). A government policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Beck*, 89 F.3d at 971 (quoting *Bielevicz*, 915 F.2d 845, 850 (3d Cir. 1990)). In contrast, "a course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well-settled' as to virtually constitute law." *Id*.

### ii.  Analysis

Plaintiffs have failed to oppose defendants' motion for summary judgment as to Count 2. Even where a local rule deems unopposed motions to be conceded, however, the Court is still required to analyze the movant's summary judgment motion under the standards of Fed. R. Civ. P. 56(e)). *See*

*Anchorage Assocs. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990); *see also Muskett v. Certegy Check Servs., Inc.*, Civ. No. 08-3975, 2010 WL 2710555 (D.N.J. July 6, 2010) ("In order to grant Defendant's unopposed motion for summary judgment, where, as here, 'the moving party does not have the burden of proof on the relevant issues,... the [Court] must determine that the deficiencies in [plaintiffs'] evidence designated in or in connection with the motion entitle the [defendants] to judgment as a matter of law.'" (quoting *Anchorage Assocs.*, 922 F.2d at 175)). I have done so, and I conclude that summary judgment must be granted in favor of the City of Plainfield on Count 2.

The parties do not appear to dispute that Plainfield had adequate policies in place. It is undisputed that all of the officers involved here had significant training with respect to police pursuits and received additional training biannually. Each officer was aware of the proper policies for a pursuit: that there be no more than two vehicles and that should an officer be involved in a pursuit, the officer must activate the car's lights and sirens. (*See*, *e.g.*, PSSOF ¶¶ 18–20; DSOF ¶¶ 29–38)) It may be that officers, despite their training, failed to comply with established pursuit policies. Plaintiffs have failed to establish, however, that the procedures of the City or the Police Department were deficient in some overall or systematic way and that these deficiencies were the cause of their injuries.

I next consider the failure-to-train theory of liability. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989). The Supreme Court has also noted that "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (citation omitted). Here, there is no evidence to establish that Plainfield failed to train its officers. Although plaintiffs point to instances where the officers at times forgot the details of certain policies (*see* PSSOF ¶

21

87), all of the officers were generally aware of the AG's pursuit policies, received training while at the police academy, and received training biannually on police pursuits. (DSOF ¶¶ 29–38) Moreover, plaintiffs present no evidence of a pattern of constitutional violations during police pursuits in Plainfield. Accordingly, I cannot conclude that Plainfield exhibited deliberate indifference when training its officers.

Finally, I consider the plaintiffs' failure-to-supervise theory. Plainfield may be liable for its failure to supervise only if it reflects a policy of deliberate indifference to constitutional rights. *See Montgomery v. De Simone*, 159 F.3d 120, 126–27 (3d Cir. 1998). Again, I see no support for this claim in the record before me. For example, there are no allegations that the City was so far detached from training its officers that it could be called deliberately indifferent to the fact that its officers could violate plaintiffs' constitutional rights.

Because plaintiffs have failed to demonstrate any facts to establish the existence of an unconstitutional policy or custom and that the policy or custom was the proximate cause of any alleged deprivation of her constitutional rights, I will **grant** summary judgment in favor of the City of Plainfield on Count 2 of the Complaint.

### D.    Count 3: Conspiracy

Plaintiffs also assert a conspiracy claim against defendants, citing 42 U.S.C. §§ 1985 and 1986. Specifically, Count 3 of the Complaint alleges that defendants "conspired for the purpose of impeding, hindering, obstructing, destroying falsifying and defeating the due course of justice with the intent to deny the Plaintiffs the protection of the laws and to injure them." (Compl. ¶ 38) Plaintiffs failed to oppose or otherwise address defendants' arguments with respect to the Count 3 conspiracy claim.

Section 1985 is a federal statute which provides civil remedies for a conspiracy which deprives a person of civil rights. It is unclear whether plaintiffs intend to raise claims under 42 U.S.C. § 1985(2) or (3). Section 1985(2) prohibits conspiracies to obstruct justice with the intent to deny equal

protection of the laws. Section 1985(3) prohibits conspiracies that deprive persons of their rights or privileges under the equal protection of the laws. A claim under § 1985(3), in particular, requires a plaintiff to demonstrate: "(1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States." *Mosca v. Cole*, 384 F. Supp. 2d 757, 769 (D.N.J. 2005), *aff'd*, 217 F. App'x 158 (3d Cir. 2007) (citing *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997). Both subsections, however, require a plaintiff to demonstrate that there was a race-based motive for the defendants' alleged actions. *Limehouse v. Delaware*, 144 F. App'x 921, 923 (3d Cir. 2005) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *Davis v. Township of Hillside*, 190 F.3d 167, 171 (3d Cir.1999))

Plaintiffs fail to point to any facts or evidence in the record to support their allegation that there was a conspiracy to obstruct justice, that defendants had a race-based motive for their actions (whether vis-à-vis Mr. Ward or themselves), or that defendants' actions were somehow discriminatory.

Plaintiffs also raise a claim under 42 U.S.C. § 1986. A cause of action under § 1986 is essentially one for misprision of a § 1985 conspiracy. *Patel v. Crist*, No. CV 19-9232, 2020 WL 64618, at *5 (D.N.J. Jan. 7, 2020) (citing *Clark v. Clabaugh*, 20 F.3d 1290, 1295 n.5 (3d Cir. 1994)). As noted above, no § 1985 conspiracy has been made out.

Because plaintiffs have not established a prima facie claim under 42 U.S.C. §§ 1985 and 1986, or any material facts in dispute regarding this claim, summary judgment is **granted** to defendants on Count 3.

### E.    Count 4: New Jersey Civil Rights Act Claim

Count 4 alleges a violation of state constitutional protections pursuant to a state-created-danger theory under the New Jersey Civil Rights Act ("NJCRA"). The NJCRA, N.J. Stat. Ann. § 10:6-2(c), provides that "[a]ny person who has

been deprived of any substantive rights, privileges or immunities secured by the Constitution or laws of this State by a person acting under color of law, may bring a civil action for damages."

The New Jersey State Legislature, when it enacted the NJCRA, intended it to parallel 42 U.S.C. § 1983, and sought to incorporate existing § 1983 jurisprudence. *Perez v. Zagami*, 218 N.J. 202, 515 (2014); *see also RaCapt. Mos v. Flowers*, 429 N.J. Super. 13, 23 (App. Div. 2012) (stating that NJCRA was "modeled on the federal civil rights law which provides for a civil action for deprivation of civil rights." (citations omitted)). Thus, the NJCRA is construed nearly identically to Section 1983.

The parties have not suggested any distinction between the NJCRA claim asserted under Count 4 and their Count 1 counterparts under 42 U.S.C. § 1983. Therefore, for the reasons outlined in Section II.B, *supra*, defendants' motions for summary judgment on Count 4 are **granted**.

### F.    Count 5: New Jersey Tort Claim Act

To say that plaintiffs do not have a constitutional claim, however, is not to say that they have no remedy at all. *See Sauers*, 905 F.3d at 723 ("We emphasize that our decision on qualified immunity does not mean that Homanko is immune from any suit arising from his conduct; he is only immune to a suit alleging the federal constitutional claims made here. He remains exposed to state law tort claims that can, and have been, brought against him, so Sauers is not without a remedy."). I therefore consider the plaintiffs' state-law claims.

### i. Supplemental Jurisdiction

Defendants Black and McCall assert that should all federal claims be dismissed, this Court should then decline to exercise supplemental jurisdiction over plaintiffs' state-law tort claims. I disagree.

Under 28 U.S.C. § 1367(c), the Court has discretion to decline jurisdiction over remaining claims after all claims over which the court possesses original jurisdiction have been dismissed from the action. The Third

Circuit has held that after all federal claims are dismissed, a "district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)); *see Shaffer v. Bd. of Sch. Dirs. of Albert Gallatin Area Sch. Dist.*, 730 F.2d 910, 912 (3d Cir. 1984) (holding that "pendent jurisdiction should be declined where the federal claims are no longer viable, absent extraordinary circumstances"). In short, the presumptive rule is that the state claims shall be dismissed, unless reasons of economy and fairness dictate otherwise.

Where the case has been substantially litigated, it may be a proper exercise of discretion to retain the state claims. *See Growth Horizons, Inc. v. Delaware County, Pa.*, 983 F.2d 1277, 1284–85 (3d Cir. 1993) (remanding for exercise of discretion as to whether to retain pendent claim, noting that where the district court already heard all evidence necessary to decide the state contract claim, it might elect to retain jurisdiction). Where, on the other hand, the case is nowhere close to summary judgment or trial, remand may be the proper course. *Freund v. Florio*, 795 F. Supp. 702, 710 (D.N.J. 1992) ("[A]t this early stage in the litigation, dismissal of the pendent state claims in a federal forum will result in neither a waste of judicial resources nor prejudice to the parties.").

Here, I will exercise my discretion to retain supplemental jurisdiction over these state claims. The matter is not in its early stages; it has been substantially litigated. This matter was filed three years ago; discovery has been completed; we are at the summary judgment stage; and the evidence underlying the state claims substantially overlaps that underlying the federal claims. I therefore find that it would be inefficient, inconvenient, and unfair to force the litigants to recommence this litigation in state court.

Accordingly, I turn to plaintiffs' claims under the New Jersey Tort Claims Act. As to these tort claims, defendants do not for the most part contest the

sufficiency of the evidence head-on. Rather, Kennovin, Black, and McCall assert that they are entitled to either absolute immunity or qualified immunity.

### ii. Absolute Immunity

The New Jersey Tort Claims Act ("NJTCA"), N.J. Stat. Ann. § 59–1–1, *et seq.*, sets the conditions under which public entities and public employees can be held liable in tort. "Except as otherwise provided by this act, a public employee is liable for injury caused by his act or omission to the same extent as a private person." N.J. Stat. Ann. § 59:3-1(a). However, "[a] public employee is not liable for an injury where a public entity is immune from liability for that injury." *Id.* § 59:3-1(c). As relevant here, the NJTCA grants immunity from liability for a law enforcement officer's infliction of injury while a person is resisting or evading arrest, or while the officer is pursuing a suspect:

> Neither a public entity nor a public employee is liable for: . . . .
>
> (b) any injury caused by: . . .
>
> > (3) a person resisting arrest or evading arrest; . . .
>
> (c) any injury resulting from or caused by a law enforcement officer's pursuit of a person.

N.J. Stat. Ann. § 59:5–2. "The liability of a public employee established by this act is subject to any immunity of a public employee provided by law and is subject to any defenses that would be available to the public employee if he were a private person." N.J. Stat. Ann. § 59:3-1(b). This immunity extends to "all injuries arising out of a police pursuit, even those that would not have occurred but for the negligence of the police." *Epifan v. Roman*, No. 11–cv–2591, 2014 WL 4828606, at *16 (D.N.J. Sept. 29, 2014) (citing *Alston v. City of Camden*, 773 A.2d 693, 697 (N.J. 2001)). However, NJTCA immunity does not extend to public employees if their conduct "was outside the scope of [their] employment or constituted a crime, actual fraud, actual malice, or willful misconduct." N.J. Stat. Ann. § 59:3–14(a).

The parties dispute the extent to which all of the officers were actually engaged in "pursuit," a status which triggers one form of Section 59:5-2(c)

immunity. Although the NJTCA does not define "pursuit," in *Torres v. City of Perth Amboy*, 329 N.J. Super. 404, 407 (N.J. Super. Ct. App. Div. 2000), the court held that the definition of pursuit under Section 5-2(c) mirrors that under the AG guidelines. The AG guidelines define pursuit as

> an active attempt by a law enforcement officer operating a motor vehicle and utilizing emergency warning lights and an audible device to apprehend one or more occupants of another vehicle when the officer reasonably believes that the driver of the fleeing vehicle is aware of the officer's attempt to stop the vehicle and is resisting apprehension by increasing vehicle speed, ignoring the officer or otherwise attempting to elude the officer.

*Chunkoo v. City of Newark Police Dep't*, No. A-4286-16T3, 2019 WL 1501548, at *4 (N.J. Super. Ct. App. Div. Apr. 4, 2019), *cert. denied*, 238 N.J. 590, 214 A.3d 174 (2019), and *cert. denied*, 238 N.J. 601, 214 A.3d 181 (2019). (*See also* Ex. R at 290)

Under these criteria, and accepting all inferences in plaintiffs' favor, a reasonable jury could determine that this definition of "pursuit" could apply to the acts of Officer McCall (and possibly those of non-defendants Lieutenant Hafeken and Officer Lordi). (*See* PSSOF 92, ¶¶ 130–33; DSOF ¶¶ 18, 24) As to Detective Black, as noted above, there is a factual dispute as to whether he engaged in "pursuit" of Ward.  On at least one permissible interpretation of the facts, then, the NJTCA "pursuit" immunity could apply to McCall or Black.

Assuming Black and McCall were in pursuit, the critical issue becomes whether they engaged in "willful misconduct" sufficient to pierce that immunity. N.J. Stat. Ann. § 59:3–14(a), quoted *supra*.

> [I]n the context of a police officer's enforcement of the law, including the pursuit of a fleeing vehicle, willful misconduct is ordinarily limited to a knowing violation of a specific command by a superior, or a standing order, that would subject that officer to discipline. Because a direct order to terminate a pursuit, or not to pursue at all under certain circumstances, would be intended to minimize the potential harm, officers who willfully disregard such commands would be aware that to do so would be to greatly enhance the risk of injury, not only to themselves but to the public at large.

> The phrase "willful misconduct" in this context naturally commands the meaning we here attribute to it: the knowing failure to follow specific orders, "knowing" that there is an order and willfully failing to follow it, *i.e.,* intentionally failing to obey the order. More particularly, willful misconduct in a police vehicular chase has two elements: 1) disobeying either a specific lawful command of a superior or a specific lawful standing order and 2) knowing of the command or standing order, knowing that it is being violated and, intending to violate it. Where the command or order is not only specific but clearly has no exceptions—expressed or implied—willful misconduct is not affected by the good faith of the public employee who believes he or she somehow had a right to knowingly and willfully disobey.

*Fielder v. Stonack*, 141 N.J. 101, 125 (N.J. 1995). Issues of fact, such as the use of sirens and adherence to the AG guidelines, preclude a finding on summary judgment that McCall and Black did or did not act willfully.

The situation is different as to Officer Kennovin. There is no record evidence that Officer Kennovin pursued (or chased, or followed) Ward. *See* N.J. Stat. Ann. § 59:5-2(c). As plaintiffs concede, Officer Kennovin's was not one of the police vehicles that followed Ward's gray car down 6th Street. (DSOF ¶ 36; PRSOF ¶ 36; KSOF ¶ 8) Indeed, Kennovin did not arrive on the scene until after the collision had occurred. (KSOF ¶¶ 9, 11) It follows that "pursuit" immunity would not apply. That suggests, however, a more basic problem with plaintiffs' theory. The NJTCA would hold this officer liable only "to the same extent as a private person." N.J. Stat. Ann. § 59:3-1(a). Kennovin indisputably did not pursue Ward at all; *a fortiori*, he cannot have done so intentionally, negligently, or in violation of the AG Guidelines. There is no evidence that Officer Kennovin did anything, negligent, intentional, or otherwise, to injure the plaintiffs. Therefore, I will **grant** Officer Kennovin's motion for summary judgment as to Count 5.

Here, there are material facts in dispute that preclude the application of absolute immunity. It remains disputed how many officers engaged in the pursuit of Mr. Ward. Plaintiffs have presented evidence, which defendants dispute, from which a reasonable jury could conclude that there were at least

three cars in pursuit, in excess of the AG's guidelines. The officer's disregard of these guidelines could reasonably contribute to a jury finding that the officers engaged in willful misconduct:

> [T]he AG Policy prohibits two police vehicles from engaging in the same pursuit, unless otherwise directed by supervisors. Such a rule leaves no discretion and *a knowing violation would constitute willful misconduct.*

*Chunkoo*, 2019 WL 1501548, at *5 (emphasis added). Moreover, there is evidence in the form of audio recordings from which a reasonable jury could conclude that some or all of the officers did not activate their sirens (or did not do so until seconds before the accident occurred), also in violation of the guidelines. The officers, having undergone significant training with respect to police pursuits, were actually aware of those AG guidelines.

In summary, then, I will **deny** the motion of defendants Black and McCall for summary judgment insofar as it seeks to dismiss plaintiffs' NJTCA claim under the doctrine of absolute immunity. Kennovin's motion for summary judgment on the NJTCA claims is **granted**.

### iii.  Qualified Immunity

Defendants also invoke the NJTCA's "qualified immunity" provision, which provides that "A public employee is not liable if he acts in good faith in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment." N.J. Stat. Ann. § 59:3-3. The immunity granted under Section 59:5-2 is more expansive than the immunity granted under 59:3-3. As to Black and McCall, however, there exists a genuine issue of material fact as to whether they engaged in willful misconduct. That being the case, "the Court cannot determine as a matter of law whether the NJTCA shields [defendants Black and McCall] from liability." *Norman v. Haddon Twp.*, No. 1:14-CV-06034-NLH-JS, 2017 WL 2812876, at *13 (D.N.J. June 29, 2017). As to them, summary judgment is therefore denied.

As to Kennovin, who is absolutely immune, this qualified immunity would apply *a fortiori*. As to him, qualified immunity would be appropriate; plaintiffs do not point to any tortious act, let alone an act that would undermine the presumption of his good faith execution of the laws. Kennovin's motion for summary judgment is therefore granted on the alternative ground of qualified immunity.

### G.    Count 7: Punitive Damages

Count 7 asserts a claim for punitive damages. Plaintiffs concede that punitive damages are not available against the City of Plainfield. (DE 51 at 15) Nevertheless, they contend that punitive damages can still be awarded against the individual defendants because their behavior evinces reckless or careless indifference. (*Id.*)

With respect to plaintiffs' claim for punitive damages under Count 7, summary judgment must be awarded to defendants. "Punitive damages" is not a cause of action but one of a number of forms of relief that might apply should some cause of action be proven:

> Punitive damages are a remedy incidental to cause of action, not a substantive cause of action in and of themselves. *See, e.g., Sellers v. School Bd. of City of Manassas*, 960 F.Supp. 1006, 1011–12 (E.D.Va.1997) (noting that compensatory and punitive damages not available under § 1983 if plaintiff does not state violation of substantive right), *aff'd*, 141 F.3d 524 (4th Cir. 1998); *California Natural, Inc. v. Nestle Holdings, Inc.*, 631 F.Supp. 465, 474 (D.N.J.1986) (noting that New Jersey law contains no independent cause of action for punitive damages); *see also* N.J. Stat. Ann. § 2A:15–5.13(c) (stating that punitive damages may be awarded under New Jersey law only if compensatory damages have been awarded)).

*Hassoun v. Cimmino*, 126 F. Supp. 2d 353, 372 (D.N.J. 2000).

Nonetheless, plaintiffs have properly requested punitive damages in their prayer for relief. (Compl. at 12) True, the NJTCA states that "No punitive or exemplary damages shall be awarded against a public entity." N.J. Stat. Ann. § 59:9-2(c). Excluded from this limitation, however, are individual public employees, such as the remaining officers here. *See Hayward v. Salem City Bd.*

*of Educ.*, No. CV 14-5200 (JBS/AMD), 2016 WL 4744132, at *6 (D.N.J. Sept. 12, 2016).

Summary judgment, then, is granted on Count 7. The demand for punitive damages in the prayer for relief is struck as to the City of Plainfield. The prayer for punitive damages remains operative, however, as to all other defendants and claims that remain in the case.

## III.   Conclusion

For the reasons set forth above, I will **grant** Officer Craig Kennovin's motion for summary judgment (DE 48) in its entirety. As to Kennovin, the entire complaint is dismissed with prejudice.

I will **grant in part and deny in part** the joint motion for summary judgment (DE 49) filed by the City of Plainfield, Officer McCall and Detective Black. Counts 1, 3, 4, and 7 are dismissed with prejudice as against Black and McCall. Counts 2, 3, 4, and 7 are dismissed with prejudice as against the City of Plainfield.

The remaining claims are as follows:

Count 5 (NJTCA) as to Defendants City of Plainfield, Black, and McCall;

Count 6 as to Defendant Ward.

An appropriate order follows.

Dated: May 15, 2020

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**

31